DIRECTV, INC. et al., Appellees and Cross–Appellants,

v.

LEVIN, Tax Commr., Appellant and Cross–Appellee.

[Cite as *DIRECTV, Inc. v. Levin*, 181 Ohio App.3d 92, 2009-Ohio-636.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–32.

Decided Feb. 12, 2009.

Steptoe & Johnson L.L.P., Pantelis Michalopoulos, Mark F. Horning, and Jeffrey M. Theodore; Calfee, Halter & Griswold L.L.P., James F. Lang, Peter A. Rosato, and Flite H. Freimann; and Heller Ehrman L.L.P., E. Joshua Rosenkranz, Eric Shapland, and Randy J. Kozel, for appellees and cross-appellants.

Richard Cordray, Attorney General, Lawrence D. Pratt, Section Chief, and Alan P. Schwepe, Julie E. Brigner, and Damion M. Clifford, Assistant Attorneys General, for appellant and cross-appellee.

Sutherland Asbill & Brennan L.L.P., Eric S. Tresh, and Walter Hellerstein; and Vorys, Sater, Seymour & Pease L.L.P., Douglas R. Matthews, and Kevin M. Czerwonka, for amicus curiae Time Warner Cable, Inc.

---

GREY, Judge.

{¶ 1} Defendant-appellant, Richard A. Levin, in his capacity as tax commissioner of the state of Ohio, appeals from a judgment of the Franklin County Court of Common Pleas in favor of plaintiffs-appellees, DIRECTV, Inc. and EchoStar Satellite Corporation ("DIRECTV" and "EchoStar," or collectively, "plaintiffs"). The plaintiffs have cross-appealed on some subsidiary aspects of the trial court's decision.

{¶ 2} The issue raised in this case is the constitutionality of various Ohio sales tax provisions affecting satellite television providers and cable television providers.

{¶ 3} In 2003, the Ohio General Assembly amended the state sales tax statutes to make retail sales of satellite broadcasting services subject to the general sales tax rate of six percent. (The general rate was later reduced to 5.5 percent.)

Pertinent sections include R.C. 5739.01(B)(3)(q), 5739.02, and 5741.02. The amended statutes specifically define what constitutes a "satellite broadcasting service": "[D]istribution or broadcasting of programming or services by satellite directly to the subscriber's receiving equipment without the use of ground receiving or distribution equipment, except the subscriber's receiving equipment or equipment used in the uplink process to the satellite * * *." R.C. 5739.01(XX). This definition excludes cable television service providers, who necessarily employ "ground receiving or distribution equipment" to deliver programming to their customers. Although cable television providers do not collect the general state sales tax from their customers, they continue to pay local franchise taxes in areas where they provide service. The imposition of these local franchise taxes is independent of the state sales tax provisions at issue in this case and, although the parties' arguments address the relative burdens and benefits of these two tax elements, the role of the local franchise taxes is ultimately not important to our analysis of the case.

{¶ 4} Plaintiffs challenged the sales tax imposed on satellite television consumers and collected by satellite television providers, and the concomitant exemption from taxation of cable television, on the ground that it violates the Commerce Clause of the United States Constitution by favoring in-state economic interests and placing an undue burden on interstate commerce, i.e., that the differential taxation provides "a direct commercial advantage to locally franchised cable television systems that is not provided to satellite television companies * * *."

{¶ 5} After allowing extensive discovery, the trial court eventually decided the matter in successive decisions addressing two rounds of summary judgment motions filed by the parties. Although the trial court concluded that the Ohio tax statutes did not facially or purposely discriminate against interstate commerce, the trial court found that the tax scheme was discriminatory in effect and impermissibly burdened satellite providers by increasing the net costs to television consumers for satellite service in comparison to cable service. In doing so, the trial court concluded that the satellite providers were out-of-state interests engaging in interstate commerce, and conversely that the cable companies were in-state economic interests. The trial court reached this conclusion primarily by comparing the relative size of the staff and physical plant used in Ohio by the two types of pay television (both have a physical presence, including employees, in Ohio, although cable television's is substantially larger) rather than the other aspects of commercial activity and scope that might establish whether one class of competitor is engaged in interstate commerce and the other not.

{¶ 6} The commissioner brings the following nine assignments of error on appeal:

1. The Trial Court erred in entering Summary Judgment in favor of Plaintiffs DIRECTV, Inc. and EchoStar Satellite Corporation on Count I of their Complaint in that the Trial Court a) declared that R.C. §§ 5739.01(B)(3)(q) (now renumbered R.C. § 5739.01(B)(3)(p)), 5739.01(XX), 5739.01(AA)(4), 5739.02, 5739.021, 5739.023, 5739.026, 5741.02, 5741.021, 5741.022 and 5741.023, are unconstitutional to the extent that they impose sales and use taxes on the retail sales of " ' satellite broadcasting services', while not imposing the taxes on the retail sales of the cable television industry" and therefore discriminate in practical effect against interstate commerce in violation of the Commerce Clause of the U.S. Constitution; and b) permanently enjoined Defendant Tax Commissioner and others "from taking any action to levy or collect sales and use taxes from Plaintiffs for the retail sales of satellite television services."

2. The Trial Court erred in denying, with the sole exception of finding no facial discrimination, Summary Judgment to Defendant Tax Commissioner on Count I of the Complaint, to wit, that R.C. §§ 5739.01(B)(3)(q) (now renumbered R.C. § 5739.01(B)(3)(p)), 5739.01(XX), 5739.01(AA)(4), 5739.02, 5739.021, 5739.023, 5739.026, 5741.02, 5741.021, 5741.022 and 5741.023, do not discriminate against interstate commerce and/or do not violate the Commerce Clause of the U.S. Constitution.

3. The Trial Court erred in entering Partial Summary Judgment in favor of Plaintiffs DIRECTV, Inc. and EchoStar Satellite Corporation on Count I of their Complaint and concomitantly denying Defendant Tax Commissioner's 6/16/04 Motion for Summary Judgment in that the Trial Court declared with respect to Count I that a) "in their practical operation, the tax provisions at issue benefit in-state economic interests and burden out-of-state economic interests"; and b) "the sales and use taxes as applied to direct broadcasting television service providers do not qualify as 'compensatory taxes'."

4. The Trial Court erred in denying Defendant Tax Commissioner's 6/16/04 Motion for Summary Judgment "on the issues of whether there was purposeful discrimination and whether cable television providers and direct broadcast satellite providers are 'similarly situated.' "

5. The Trial Court erred in denying Defendant Tax Commissioner's 9/20/2006 Motion for Reconsideration "[t]o the extent that the Commissioner asks the Court to modify or vacate its earlier decisions."

6. The Trial Court erred in granting Plaintiffs' 12/22/06 Second Motion for Summary Judgment and concomitantly denying Defendant Tax Commissioner's 12/26/06 (Second) Motion for Summary Judgment, thereby concluding that a) the cable broadcasting industry and satellite broadcasting industry are "similarly situated" for dormant Commerce Clause purposes; b) the "Defendant has not met the State's burden of justifying the discrimination against interstate

commerce that exists in this case"; and c) "the Ohio sales and use taxes are unconstitutional to the extent, that they apply to direct broadcasting satellite television services while not applying to cable television services."

7. The Trial Court erred in granting Plaintiffs' 11/6/06 Motion for Protective Order thereby quashing Defendant Tax Commissioner's October 31, 2006, Deposition subpoenas and further prohibiting the Defendant from discovering and presenting information directly relevant and material to the Trial Court's novel rationale for determining Commerce Clause discrimination.

8. The Trial Court erred in admitting into evidence and giving substantial weight to the written positions of lobbyists as evidence of the General Assembly's purpose in adopting amendments to Ohio's sales and use tax provisions and/or as evidence of whether Satellite and Cable Companies are "similarly situated."

9. The Trial Court erred in ruling that it was proper to consider the individual thoughts of members of the General Assembly in determining the General Assembly's purpose in adopting amendments to Ohio's sales and use tax provisions and/or as evidence of whether Satellite and Cable Companies are "similarly situated."

{¶ 7} The plaintiffs have filed a cross-appeal and bring the following three assignments of error:

1. The trial court erred in finding that it lacked authority to order the repayment of unlawfully collected taxes despite the plain language of R.C. 2723.01.

2. The trial court erred in requiring plaintiffs-cross-appellants ("plaintiffs") to apply for refunds through the administrative process set forth in R.C. 5739.07, which does not apply to challenges to the validity of a tax law and which imposes requirements virtually impossible to satisfy in this type of case.

3. The trial court erred in holding that plaintiffs are not entitled to reimbursement of their attorneys' fees and costs out of the common fund that they created through this litigation.

{¶ 8} We initially note that this matter was decided in the trial court by summary judgment, which under Civ.R. 56(C) may be granted only when there remains no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, that conclusion being adverse to the party opposing the motion. *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 629, 605 N.E.2d 936, citing *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. Additionally, a moving party cannot discharge its burden under Civ.R. 56 simply by making conclusory assertions that the nonmoving party has no evidence to prove its case. *Dresher v. Burt* (1996), 75 Ohio St.3d

280, 293, 662 N.E.2d 264.  Rather, the moving party must point to some evidence that affirmatively demonstrates that the nonmoving party has no evidence to support his or her claims.  Id.

{¶ 9} An appellate court's review of summary judgment is de novo.  *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265; *Bard v. Soc. Natl. Bank* (Sept. 10, 1998), Franklin App. No. 97APE11–1497, 1998 WL 598092.  Thus, we conduct an independent review of the record and stand in the shoes of the trial court.  *Jones v. Shelly Co.* (1995), 106 Ohio App.3d 440, 445, 666 N.E.2d 316.  As such, we have the authority to overrule a trial court's judgment if the record does not support any of the grounds raised by the movant, even if the trial court failed to consider those grounds.  *Bard.*

{¶ 10} The commissioner's first six assignments of error all address different facets of the principal issue in this case, the constitutionality of the sales tax on satellite television providers and the exemption of cable television providers therefrom, and they will be addressed together.

{¶ 11} The invalidation of Ohio's sales tax in this case is based upon the power of the United States Congress to "regulate Commerce with foreign Nations, and among the several states," constituting the Commerce Clause of the United States Constitution.  Section 8, Article I, United States Constitution. More specifically, at issue here is the so-called "dormant" or "negative" aspect of the Commerce Clause, the implicit corollary that if Congress is to regulate commerce between the states and with foreign nations, then state governments may not impose taxes or other conditions that will impede the free flow of trade between states.  *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 278, 97 S.Ct. 1076, 51 L.Ed.2d 326, fn. 7.

{¶ 12} When the alleged infringement by state law is in the form of a tax, the United States Supreme Court has held broadly that a tax is discriminatory if it taxes a "transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State."  *Chem. Waste Mgt. v. Hunt* (1992), 504 U.S. 334, 342, 112 S.Ct. 2009, 119 L.Ed.2d 121, quoting *Armco Inc. v. Hardesty* (1984), 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540.  For purposes of the dormant commerce clause, "discrimination" is defined as " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' "  *Granholm v. Heald* (2005), 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796, quoting *Oregon Waste Sys., Inc. v. Dept. of Environmental Quality of Oregon* (1994), 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13. States may not impose a tax that provides a direct commercial advantage to local businesses and thus burdens and discriminates against interstate commerce.

*Northwestern States Portland Cement Co. v. Minnesota* (1959), 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421.

{¶ 13} A tax provision will not run afoul of the commerce clause if (1) the activity taxed has a substantial nexus with the taxing state, (2) the tax is fairly apportioned to reflect the extent of commercial activity within the taxing state, (3) the tax does not discriminate against interstate commerce, and (4) the tax is fairly related to benefits provided by the state. *Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. 1076, 51 L.Ed.2d 326. The third ground for a commerce clause challenge given above is the one at issue in the case before us. A statute may "discriminate" against interstate commerce in three ways: (1) it may be facially discriminatory, (2) it may have discriminatory intent, or (3) it may have a discriminatory effect in practice. *Amerada Hess Corp. v. Dir., Div. of Taxation New Jersey Dept. of the Treasury* (1989), 490 U.S. 66, 78, 109 S.Ct. 1617, 104 L.Ed.2d 58. As a final caveat, even a state tax provision that discriminates in practice against interstate commerce may pass constitutional scrutiny if it " 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' " *Oregon Waste Sys.,* 511 U.S. at 101, 114 S.Ct. 1345, 128 L.Ed.2d 13, quoting *New Energy Co. of Indiana v. Limbach* (1988), 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302.

{¶ 14} Despite the sweeping principles regarding unequal taxation set forth above, the United States Supreme Court has frequently found that differential taxation is not discriminatory taxation, and, in fact, dormant commerce clause tax cases from different commercial domains are often difficult to reconcile. The Supreme Court itself has stated that such cases call upon courts to "make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers." *Boston Stock Exchange v. State Tax Comm.* (1977), 429 U.S. 318, 329, 97 S.Ct. 599, 50 L.Ed.2d 514. "[T]he result turns on the unique characteristics of the statute at issue and the particular circumstances in each case. * * * This case-by-case approach has left 'much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.' " Id., quoting *Northwestern States,* 358 U.S. at 457, 79 S.Ct. 357, 3 L.Ed.2d 421.

{¶ 15} Applying the "case-by-case" standard rather deferentially to the states' "indispensable" power to tax, the Supreme Court has allowed many challenged statutes to survive commerce clause scrutiny. Two such cases are heavily cited by the commissioner. In *Amerada Hess,* 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58, the challenged New Jersey statute provided a credit against state taxes for certain federal taxes, but denied the credit for federal windfall profit taxes paid by oil producers. Because New Jersey had no domestic oil production

activity, out-of-state oil producers engaging in other aspects of oil distribution and sales in New Jersey did not receive a state tax credit for federal windfall taxes paid, although they received the same tax credit for other forms of federal taxes as domestic competitors who had no production activities and therefore were not subject to the windfall tax. Despite this superficially comparable treatment of in-state oil distribution and sales activities for tax purposes, oil producers asserted that the denial of the state tax credit for their federal windfall profits tax discriminated against interstate commerce because it affected only out-of-state companies due to New Jersey's lack of a domestic oil production industry. 490 U.S. at 70–72, 109 S.Ct. 1617, 104 L.Ed.2d 58. The court rejected the contention that the state had singled out for "special tax burdens a form of business activity that is conducted only in other jurisdictions," 490 U.S. at 77, 109 S.Ct. 1617, 104 L.Ed.2d 58, and likewise found that the tax scheme did not exert impermissible pressure on outside firms to conduct additional business in-state: "Denying a deduction for windfall profit tax payments cannot create oil reserves where none exist and therefore cannot be considered an incentive for oil producers to move their oil-producing activities to New Jersey," 490 U.S. at 78, 109 S.Ct. 1617, 104 L.Ed.2d 58. "Whatever different effect the [tax] provision may have on these two categories of companies results solely from differences between the nature of their businesses, not from the location of their activities." Id.

{¶ 16} In *Exxon Corp. v. Maryland* (1978), 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91, the challenged Maryland statute prohibited a producer or refiner of petroleum products from operating retail gas stations in the state. As in *Amerada Hess,* 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58, producers challenged the law on the basis that it was inherently discriminatory against out-of-state retailers, because Maryland had no domestic companies engaged in oil refining or production and the statute thus excluded only out-of-state firms from retail operation in the state. The court held that although the burden of the ban fell in practice on out-of-state companies due to the absence of in-state refiners, the statute was aimed at a method of doing business (vertically integrated companies) that had led to price inequities, not at protection of local interests to the detriment of interstate commerce: "In fact, the Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market. The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce." 437 U.S. at 126, 98 S.Ct. 2207, 57 L.Ed.2d 91.

{¶ 17} In contrast, two other cases from the United States Supreme Court are notable instances in which a tax has run afoul of the dormant Commerce Clause and are invoked by the plaintiffs in the present case. In *Bacchus Imports, Ltd. v. Dias* (1984), 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200, the plaintiff liquor importers challenged a tax on wholesale liquor sales that provided an exemption for certain peculiarly local liquors, specifically okolehao, a traditional brandy distilled from the root of an indigenous shrub, and fruit wines manufactured in-state. The Supreme Court found that the exemption amounted to economic protectionism and violated the Commerce Clause because it expressly favored locally produced products in competition with imported ones, demonstrating both discriminatory purpose and effect. The court further held that the state could not support a favorable inquiry regarding the balance between local benefits and burden on interstate commerce that might have validated an otherwise discriminatory statute.

{¶ 18} In *W. Lynn Creamery v. Healy* (1994), 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157, the court struck down a statute that required all milk dealers in Massachusetts to contribute to a price equalization fund based on all sales, whether locally produced or imported. The state then distributed the fund to domestic milk producers. Noting that although the tax applied to all producers whether in-state or out-of-state, the proceeds were distributed to in-state producers only, the court concluded that this amounted to a direct monetary subsidy of in-state producers. 512 U.S. at 203, 114 S.Ct. 2205, 129 L.Ed.2d 157. "By conjoining a tax and a subsidy, Massachusetts has created a program more dangerous to interstate commerce than either part alone." 512 U.S. at 199–200, 114 S.Ct. 2205, 129 L.Ed.2d 157. The court summed up the violative nature of the tax and subsidy arrangement by characterizing it as the "paradigmatic example" of a law that violates the dormant Commerce Clause, a protective tariff. 512 U.S. at 193 and 203, 114 S.Ct. 2205, 129 L.Ed.2d 157.

{¶ 19} In light of the Supreme Court's admonition to consider Commerce Clause cases on a case-by-case basis with an eye to the "unique characteristics of the statute at issue and the particular circumstances in each case," *Boston Stock Exchange*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514, we turn from the conflicting precedent found in the petroleum, dairy, and liquor industries to those cases addressing taxation of pay television, which are not lacking. Unlike the precedent in other commercial sectors, the unanimous weight of precedent here lies on the side of taxing authorities in cases involving differential taxation for satellite and cable television providers. The parties' briefs cite five different trial and appellate court cases (not including the trial court decision in our case), all reaching outcomes in favor of taxing authorities. Two of these guide our analysis of this case and will be discussed at length.

{¶ 20} In *DIRECTV, Inc. v. North Carolina* (2006), 178 N.C.App. 659, 632 S.E.2d 543, satellite television providers challenged a North Carolina sales tax on satellite television services coupled with an exemption for cable television services. The North Carolina appellate court stressed in its decision cases such as *Chem. Waste Mgt.*, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121, that discussed and defined the effect of the dormant Commerce Clause to bar differential treatment of in-state and out-of-state economic interests. In essence, the court rejected the satellite providers' argument that their technological means of delivery for programming were inherently out-of-state and that cable providers, conversely, were inherently in-state. 178 N.C.App. at 666–667, 632 S.E.2d 543. The court relied extensively on the ruling in *Amerada Hess*, 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58, particularly the language that emphasized that the difference in taxation in that case resulted solely from the nature of the business activity and not its location. The North Carolina court reasoned that satellite providers would be subject to taxation regardless of whether some, any, or none of their facilities were located in-state. Similarly, cable providers with a significant or even predominant portion of their cable delivery systems outside of North Carolina would still be exempt from the sales tax imposed on satellite providers. 178 N.C.App. at 666–667, 632 S.E.2d 543. In substance, the court concluded that the differential tax upon television programming delivery technology that appeared to discriminate against a delivery mechanism that *necessarily* incorporated an out-of-state component, i.e., satellites in orbit above the earth, in the final analysis did not burden interstate commerce because the tax was neither facially discriminatory nor discriminatory in its practical effect.

{¶ 21} Satellite providers next challenged a differential tax plan in *Directv, Inc. v. Treesh* (C.A.6, 2007), 487 F.3d 471, involving a Kentucky tax scheme that charged a three-percent excise tax on all pay television and an additional 2.4 percent gross revenue tax on pay television providers. Proceeds from both were held in a dedicated tax fund. This fund then was disbursed to local taxing authorities in an amount equal to past excise taxes imposed upon cable television providers, but this distribution to local governments was in exchange for local governments foregoing such franchise taxes. If local governments did not forego franchise taxes, the cable providers would receive an equivalent tax credit from the state. Satellite providers contested both the tax credit/rebate scheme and also the bar against local franchise taxes on cable television providers. The district court upheld Kentucky's tax plan by granting a motion to dismiss, *DIRECTV v. Treesh* (E.D.Ky.2006), 469 F.Supp.2d 425, and the plaintiff satellite providers appealed to the Sixth Circuit.

{¶ 22} As the North Carolina appellate court did, the Sixth Circuit stressed in *Treesh* that the differential taxation between cable television and satellite televi-

sion providers did not discriminate based upon geographic location or domicile, but rather upon the use of different technologies under different business models. 487 F.3d 471, 481. The Sixth Circuit in *Treesh* refused to apply cases such as *W. Lynn Creamery* and *Bacchus Imports,* finding that the differential taxation of television delivery technologies is not, unlike the objectionable laws in those cases, calculated to divert market share to a local producer at the expense of out-of-state businesses. The court in *Treesh* preferred to compare the commercial context of the tax to that in *Amerada Hess* and *Exxon,* considering that the competing goods in the case are not distinguished by origin, but by business model and thus means of delivery. 487 F.3d 471, 480.

{¶ 23} We find that the above precedent is persuasive when applied to the case before us, as well it should be, as the cases were decided on essentially identical pertinent facts. The sales tax imposed by Ohio on satellite television providers and not upon cable television providers does not violate the dormant Commerce Clause. The clause protects interstate commerce and the interstate market for products, but does not protect "the particular structure or methods of operation in [the] retail market," *Exxon Corp.,* 437 U.S. at 127, 98 S.Ct. 2207, 57 L.Ed.2d 91, and the "Commerce Clause is not violated when the differential tax treatment of two categories of companies 'results solely from differences between the nature of their businesses, not from the location of their activities.'" *Kraft Gen. Foods v. Iowa Dept. of Revenue & Fin.* (1992), 505 U.S. 71, 78, 112 S.Ct. 2365, 120 L.Ed.2d 59, quoting *Amerada Hess,* 490 U.S. at 66, 109 S.Ct. 1617, 104 L.Ed.2d 58. As the North Carolina court noted, "neither satellite companies nor cable companies are properly characterized as an in-state or out-of-state economic interest," based upon their physical presence and corporate organization in Ohio and other states. *North Carolina,* 178 N.C.App. at 664, 632 S.E.2d 543.

{¶ 24} Before us are two modes of interstate business. One delivers pay TV programming directly to the consumer's home, via satellite, to a decoder that may be owned either by the consumer or the satellite television provider. The other delivers pay television to the consumer's home, in some cases utilizing a company-owned set-top decoder, via cable from a "headend" distribution center that receives the imported programming, again often via satellite. Both business models obtain most programming from outside of Ohio and redistribute it to consumers in the state. Both also gather local programming and distribute it to Ohio consumers, and, in some areas, consumers in neighboring states where the customary service markets of Ohio stations "bulge" across state lines. In addition, some locally produced programming is exported nationwide. On an organizational level, the two plaintiff satellite television providers are national companies headquartered outside Ohio. Although some small local cable operations may benefit from the sales tax exemption, the cable companies that provide

significant competition in the pay television field are very large regional companies, also headquartered outside Ohio.

{¶ 25} Even if we focus exclusively on the technological means of program distribution, as the plaintiffs urge us to do, the two classes of competitors cannot be segregated into interstate and local enterprises on the sole basis that the satellite providers place equipment in outer space that necessarily is out of the state of Ohio. In fact, the use of orbital satellites cannot be the distinguishing feature of the two pay television technologies, because cable providers also receive much programming via satellite at the headend centers. The tax distinction between satellite and cable providers does not discriminate against interstate commerce as a whole, but places a burden against one form of delivering pay television to consumers, and the burden would fall equally on a satellite provider headquartered in Ohio, having all program content, satellite uplink, account services, and customers in-state. See, generally, *Brown & Williamson Tobacco Corp. v. Pataki* (C.A.2, 2003), 320 F.3d 200 (upholding New York statute banning both in-state and out-of-state mail-order sales of cigarettes).

{¶ 26} The simple facts of the type of commerce involved here must inevitably be distinguished from those in *Bacchus Imports* and *W. Lynn Creamery*, which involved both a tax on imported products and a related subsidy to in-state manufacturers of such products. Those cases came much closer to the clearly prohibited barrier to interstate commerce that amounted to a tariff, which is clearly prohibited by the Commerce Clause. *W. Lynn Creamery*; *Bacchus*; *Amerada Hess*.

{¶ 27} Supreme Court precedent in *Exxon* and *Amerada Hess* demonstrates that the dormant Commerce Clause should not be conceived to protect particular technological or commercial models, but to protect interstate commerce and interstate access to the markets of a given state. The plaintiff satellite companies in the present case have not demonstrated that Ohio's sales tax provisions discriminate against the interstate market for pay television, whether delivered by cable or satellite. At best, the plaintiffs have persuasively, but ultimately to no end, established that they are more burdened by Ohio's tax provision than comparable interstate cable providers. Discrimination between different forms of interstate commerce is not discrimination *against* interstate commerce.

{¶ 28} Because we find that Ohio's sales tax, as applied to the satellite television providers and not applied to cable television providers, does not run afoul of the dormant Commerce Clause because both of these providers are engaged in interstate commerce, we do not examine the question of whether cable television, by providing additional services in the form of internet access and telephone service, presents sufficient alternate benefits to warrant differential taxation. Nor do we examine the question of whether the amount and burden of

franchise fees, which are paid by cable television providers and not by satellite television providers, essentially equalizes taxation on the two means of delivering pay television to Ohio consumers.

{¶ 29} In accordance with the foregoing, the commissioner's first six assignments of error have merit, and the trial court's decision granting summary judgment to plaintiffs is in error.

{¶ 30} The commissioner's seventh assignment of error alleges procedural error in that the trial court granted a protective order that denied the commissioner the opportunity to obtain further evidence to develop facts regarding the relative scope of operations by the plaintiff satellite companies in-state and out-of-state. In light of our decision in this matter, this ruling by the trial court was not prejudicial, as the commissioner was able to develop sufficient evidence on this issue. The commissioner's seventh assignment of error is overruled.

{¶ 31} The commissioner's eighth assignment of error asserts that the trial court erred by allowing into evidence and then considering for evidentiary purposes written evidence submitted by the plaintiffs regarding arguments presented by lobbyists for the cable television industry in support of the current statutory tax scheme. Given that this matter was decided on summary judgment, the issue is not truly one of evidentiary admissibility, but rather whether the trial court erred on giving weight to these materials in granting summary judgment.

{¶ 32} The trial court allowed these materials into evidence on the basis that they could by extrapolation provide support for the discriminatory intent of the statute, and in fact, the record amply demonstrates that the cable companies did heavily lobby the Ohio legislature for preferential tax treatment on the basis that cable television historically presented a heavier local investment in infrastructure and employment. Lobbying efforts on behalf of legislation, however, are not probative of the intent of the legislature in enacting it.

{¶ 33} "Ohio has no official legislative history and, consequently, sponsor testimony is of limited value" in legislative interpretation. *Glick v. Sokol,* 149 Ohio App.3d 344, 2002-Ohio-4731, 777 N.E.2d 315, at ¶ 10. As a consequence, a court may not resort to legislative history, such as the comments of a legislator regarding enactments, to alter the clear wording of the legislative enactment. *Cleveland Trust Co. v. Eaton* (1970), 21 Ohio St.2d 129, 138, 50 O.O.2d 354, 256 N.E.2d 198; *Associated Builders & Contrs. of Cent. Ohio v. Franklin Cty. Bd. of Commrs.,* Franklin App No. 08AP–301, 2008-Ohio-2870, 2008 WL 2390797. We conclude that these statements in discussions regarding the pending tax legislation are of little value in resolving this constitutional challenge. The commissioner's eighth assignment of error is accordingly sustained to the

extent that the trial court used such materials to assess the constitutionality of the tax statutes.

{¶ 34} The commissioner's ninth assignment of error asserts that the trial court erred in allowing consideration of certain statements reflecting the reasoning of members of the legislature for enacting the tax provisions at issue. For the same reasons set forth in the preceding discussion, this assignment of error has merit and is sustained.

{¶ 35} In accordance with the foregoing, the first, second, third, fourth, fifth, sixth, eighth, and ninth assignments of error brought by the commissioner are sustained, and his seventh assignment of error is overruled. The judgment of the Franklin County Court of Common Pleas granting summary judgment to plaintiffs is reversed. Plaintiffs' assignments of error on cross-appeal are rendered moot by our disposition of the appeal and are overruled. The matter is remanded to the trial court to enter summary judgment for defendant-appellant Richard A. Levin, Tax Commissioner of Ohio.

Judgment reversed
and cause remanded with instructions.

FRENCH, P.J., and BRYANT, J., concur.

GREY, J., retired, of the Fourth Appellate District, sitting by assignment.